UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA BARKER and WILLIAM BARKER, | ) | |
| | ) | |
| Plaintiffs, | ) | 13 C 4369 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| QUICK TEST, INC. and MVL GROUP INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Patricia Barker and William Barker allege that Quick Test, Inc. and its former parent, MVL Group Inc., violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, by failing to compensate them for all hours worked, failing to pay required overtime, and retaliating against them for bringing this suit. Doc. 39. Discovery has closed and a jury trial is set for May 16, 2016. Doc. 112.

Quick Test has moved for summary judgment on the wage-and-hour claims and partial summary judgment on the retaliation claims—summary judgment *is* sought on William's retaliatory discipline, scheduling, and termination claims and on Patricia's retaliatory scheduling claim as it pertains to an alleged work hour reduction in January 2014, and is *not* sought on William's retaliatory denial of a promotion claim and Patricia's retaliatory termination claim and retaliatory discipline claims (including retaliatory scheduling other than the alleged January 2014 work hour reduction)—while MVL Group has moved for summary judgment on all claims. Doc. 119. MVL Group is granted summary judgment as to all claims against it, and Quick Test is granted summary judgment on: (1) all FLSA and IMWL claims; (2) William's IWPCA claims;

1

(3) William's retaliatory discipline claim insofar as it pertains to warnings or incidents other than the warning on January 20, 2014; and (4) William's retaliatory scheduling claim. Summary judgment is denied on: (1) Patricia's IWPCA claims; (2) William's retaliatory discipline claim insofar as it pertains to the warning on January 20, 2014; (3) William's retaliatory termination claim; and (4) Patricia's retaliatory scheduling claim. Plaintiffs' motion to strike portions of Defendants' affidavits, Doc. 132, is denied, and Plaintiffs' motion to deem certain facts admitted, Doc. 144, is denied except with respect to ¶¶ 72-73 of their Local Rule 56.1(b)(3)(C) statement, which are deemed admitted.

## Background

### A. Evidentiary Issues

Before setting forth the facts, the court resolves the following evidentiary issues.

### 1. Plaintiffs' Use of Their Interrogatory Answers

In disputing several paragraphs of Defendants' Local Rule 56.1(a)(3) statement, Plaintiffs' Local Rule 56.1(b)(3)(B) response cites their answers to Defendants' interrogatories. Doc. 130 at ¶¶ 19-20, 22-25, 27-29; *see also* Doc. 141 at ¶¶ 3-5, 101. Defendants contend that Plaintiffs cannot use their interrogatory answers as evidence on summary judgment because those answers violate 28 U.S.C. § 1746. Doc. 138 at 4; Doc. 141 at ¶¶ 3-5. If the interrogatory answers are not admissible, Plaintiffs may not use them to oppose summary judgment. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a summary judgment motion … a party may rely only on admissible evidence.").

Section 1746, which governs unsworn statements, provides in relevant part:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of

the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

…

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

28 U.S.C. § 1746(2). The filed versions of Plaintiffs' interrogatory answers attach this page signed by Patricia and a materially identical page signed by William:

### AFFIANT'S SWORN SIGNATURE TO ANSWERS

STATE OF ILLINOIS )
) SS
COUNTY OF _____ )

    The Undersigned, the Plaintiff _____, on oath deposes and states that he/she has read the foregoing Interrogatory and the Answers thereto, and the Answers given are true and correct, to the best of Affiant's knowledge and belief.

*Patricia Barker*

Doc. 131-4 at 17-18. These pages do not contain the precise language set forth in § 1746(2), as they do not state the execution date or that they were sworn under penalty of penalty of perjury. So the question becomes whether the pages are "in substantially the … form" as the language set forth in § 1746(2).

      In the summary judgment context, the Seventh Circuit has approved the use of sworn declarations that quote an earlier interrogatory answer, *see Anderson v. Credit Bureau Collection Servs., Inc.*, 422 F. App'x 534, 537 (7th Cir. 2011), and of unsworn statements that satisfy

§ 1746, *see Owens v. Hinsley*, 635 F.3d 950, 954-55 (7th Cir. 2011) (collecting cases for the proposition that "a declaration under § 1746 is equivalent to an affidavit for purposes of summary judgment"); *Tyler v. Runyon*, 70 F.3d 458, 462 & n.4 (7th Cir. 1995), but it has repeatedly held that an unsworn statement that "did not subject [the declarant] to the penalties for perjury[] was not within the range of evidence that [a] district court could consider." *DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 471 (7th Cir. 1990); *see also Jajeh v. Cook Cnty.*, 678 F.3d 560, 567-68 & n.3 (7th Cir. 2012) (same); *McConnell v. Ritz-Carlton Watertower*, 39 F. App'x 417, 420 (7th Cir. 2002) (same); *United States v. Wellman*, 830 F.2d 1453, 1467 (7th Cir. 1987) (same); *Pfeil v. Rogers*, 757 F.2d 850, 859 & n.15 (7th Cir. 1985) ("Affidavits are admissible in summary judgment proceedings if they are made under penalties of perjury; only unsworn documents purporting to be affidavits may be rejected."). Here, Plaintiffs' interrogatory answers are not dated and contain no verification or statement that they were made under penalty of perjury. Doc. 131-14 at 17-18. The answers therefore do not satisfy § 1746 and cannot be deployed on summary judgment.

This result finds support in decisions from other circuits. The Second Circuit recently summarized the operation of § 1746:

> Section 1746 provides that an unsworn matter may be treated as sworn, provided that it is "prove[n] by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, *as true under penalty of perjury,* and dated, in substantially the ... form" of the model declaration provided. 28 U.S.C. § 1746 (emphasis added). Parsing the declaration provided in the statute reveals its substantive elements: the declarant must (1) "declare (or certify, verify, or state)," (2) "under penalty of perjury," (3) that the matter sworn to is "true and correct."

*In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013). Applying that standard, the Second Circuit held that the "substitution of 'subject to punishment' for 'under penalty of perjury'" in an unsworn statement "is a substantial departure from the substance of the

declaration provided in § 1746, and thus, does not comply with the statute." *Ibid*. The court reasoned:

> Inclusion of the language "under penalty of perjury" is an integral requirement of the statute for the very reason that it impresses upon the declarant the specific punishment to which he or she is subjected for certifying to false statements. Moreover, as the Fifth Circuit has observed, omission of the phrase "under penalty of perjury" would "allow[] the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods." *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988). We hold that 28 U.S.C. § 1746 requires that a certification of the truth of a matter be expressly made under penalty of perjury. Any other result would be contrary to the plain language of the statute and the objective sought to be advanced by it.

*Ibid.* (footnote omitted).

Other circuits adhere to this approach. *See McCaskill v. Ray*, 279 F. App'x 913, 915 (11th Cir. 2008) (on summary judgment, rejecting an unsworn statement because it did not "include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury"); *United States v. Berry*, 219 F. App'x 290, 292 & n.2 (4th Cir. 2007) ("Berry's statement in his notice of appeal attached as an exhibit does not comport with the requirements of … 28 U.S.C. § 1746, as it is not notarized, makes no reference to the potential penalty for perjury, and is not specifically dated."); *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) ("[T]he affiants failed to execute their affidavits under penalty of perjury as mandated by § 1746. Therefore, we hold that the district court was authorized to exclude sua sponte such affidavits from its consideration of the first summary judgment motion."); *United States v. Streck*, 62 F. App'x 575, 576-77 (6th Cir. 2003) (holding that a notice of appeal that was neither sworn under penalty of perjury nor notarized violated § 1746). One outlier concerns a *pro se* litigant who quickly corrected his failure to declare under penalty of perjury that his testimony was true and correct. *See Davis v. Fernandez*, 798 F.3d 290, 291-92 (5th Cir. 2015). Plaintiffs

here are not *pro se*, and they have made no effort to correct the signature pages in the many months since they served their interrogatory answers.

Plaintiffs respond that because their interrogatory answers are not sworn declarations, they should be subject only to Federal Rule of Civil Procedure 33(b)(3), which provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Doc. 149 at 1-2. This argument fails because § 1746 by its own terms applies to Rule 33. *See* 28 U.S.C. § 1746 ("Wherever, under any law of the United States or under *any rule*, regulation, order, or requirement made pursuant to law ….") (emphasis added).

Because Plaintiffs' interrogatory answers do not comply with § 1746, Plaintiffs may not rely on them in opposing summary judgment. *See DeBruyne*, 920 F.2d at 471. The next inquiry is whether Plaintiffs' denials of ¶¶ 19-20, 22-25, and 27-29 of Defendants' Local Rule 56.1(a)(3) statement rely on evidentiary materials other than the inadmissible interrogatory answers and, if so, whether those materials support the denials.

Citing William's deposition transcript, Defendants' ¶¶ 19-20 assert that William "does not have any documents reflecting how much time he spent performing work from home, [that] he cannot estimate how many hours per week he spent performing work at home," and that he testified "that there were times since 2012 that he performed off-the-clock work at home, but he cannot identify when and cannot estimate how much time was spent performing that work from home." Doc. 130 at ¶¶ 19-20; *see also* Doc. 121-5 at 52. William admits that he does not have any such documents, but denies that he cannot estimate how many hours he worked from home. To support his denial, William cites his interrogatory answers (which are not admissible) and another portion of his deposition transcript where he testified that Defendants' counsel had not given him a copy of his own interrogatory answers before he testified that he could not estimate

how many hours he worked from home. Doc. 130 at ¶¶ 19-20 (citing Doc. 121-5 at 52). That portion of his deposition transcript does not support his denial. Defendants' counsel was under no obligation to give William a copy of his interrogatory answers to use as a "cheat sheet" during his deposition. *See Monroe v. Sisters of St. Francis Health Servs.*, 2011 WL 4399236, at *3 (N.D. Ind. Sept. 21, 2011) ("A deposition is not a take home exam."). And the fact that William at his deposition could not even hazard an *estimate* as to how many hours he worked from home casts further doubt, not that any further doubt is needed, over the value of his unsworn and undated interrogatory answers.

Citing Patricia's deposition transcript, Defendants' ¶¶ 22-25 assert that Patricia testified that she did not know if she was paid for working at home, did not know how many hours she worked from home, did not know whether she even worked more than ten off-the-clock hours from home, and did not know how many hours William worked from home. Doc. 130 at ¶¶ 22-25. To support her denial, Patricia cites her interrogatory answers (which are not admissible) and another portion of her deposition transcript where, like William, she testified that Defendants' counsel had not given her a copy of her own interrogatory answers before she gave that testimony. *Ibid.* (citing Doc. 121-6 at 71). For the reasons just given, that deposition testimony does not support Patricia's denial. Plaintiffs also contend that deposing counsel engaged in "deposition 'tactics' … that purposefully jumped from subject to subject without any reason[,] constantly interrupted" Patricia, and "asked vague unfocused questions." *Ibid.* Plaintiffs' assessment of Defendants' counsel's "tactics" does not fairly reflect what occurred at the deposition and provides no justification for disregarding Patricia's testimony regarding her knowledge (or lack thereof) of the hours she worked at home. Plaintiffs do cite Patricia's testimony that she worked at home on occasion, but in the same breath she allowed that she

might have been paid for such work, so the testimony does not support Plaintiffs' submission that Patricia engaged in unpaid work from home. Doc. 130 at ¶ 22 (citing Doc. 121-6 at 55-56); *see Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) ("Favor toward the nonmoving party [on summary judgment] does not extend to drawing inferences that are supported by only speculation or conjecture."); *Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1211 (7th Cir. 1993) ("[A]t some point a party who discounts his knowledge of a certain subject cannot create a 'genuine' issue of fact by contradicting unequivocal testimony about the subject."), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

Citing William's and Patricia's deposition transcripts, Defendants' ¶¶ 27-29 assert that William testified that he could not identify when he did not receive his full commission, and that William and Patricia testified that they have no documents showing that any changes were made to their commissions and do not know how much in commissions they are owed. Doc. 130 at ¶¶ 27-29. To support their denial, Plaintiffs cite their interrogatory answers (which are not admissible) and the affidavit of Teresa Linson. *Ibid.* (citing Doc. 131-6 at ¶¶ 11-14). Linson's affidavit nowhere mentions William's commissions. Although the affidavit does aver that Linson saw another Quick Test employee taking commissions from the "payroll and commissions documents from Patricia Barker," Doc. 131-6 at ¶ 12, it does not undermine Defendants' assertion that *Patricia* has no documents "reflecting the amount of commissions that she is owed or that she has any way to estimate how much" Quick Test owes her in wrongfully withheld commissions.

Because ¶¶ 19-20, 22-25, and 27-29 of Plaintiffs' Local Rule 56.1(b)(3)(B) response do not properly contradict the corresponding paragraphs of Defendants' Local Rule 56.1(a)(3) statement, Doc. 130 at ¶¶ 19-20, 22-25, 27-29, Defendants' assertions in those paragraphs are

deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(B) (requiring the non-movant to provide "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). So, too, are ¶¶ 58 and 76 of Defendants' Local Rule 56.1(a)(3) statement, as Plaintiffs do not cite any evidence to support their denials of those paragraphs. Doc. 130 at ¶¶ 58, 76.

### 2. Plaintiffs' Motion to Strike Portions of the Weingarten and Gusmano Affidavits

Defendants submitted the affidavits of Lois Weingarten and Donna Gusmano as part of their Local Rule 56.1 materials. Docs. 121-2, 121-4. Plaintiffs have moved to strike certain portions of those affidavits on the ground that they contradict Weingarten's and Gusmano's deposition testimony. Doc. 132. The governing legal principle is clear: "[L]itigants cannot create sham issues of fact with affidavits that contradict their prior depositions," *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009), though "an affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Castro v. DeVry Univ.*, 786 F.3d 559, 572 (7th Cir. 2015) (internal quotation marks omitted); *see also Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015) ("A 'sham affidavit' is an affidavit that it is inadmissible because it contradicts the affiant's previous testimony."). The question here is whether Weingarten's and Gusmano's affidavits do in fact contradict their deposition testimony. Because there is no contradiction, Plaintiffs' motion is denied.

Paragraph 11 of Weingarten's affidavit avers that she "was unaware of anyone, including [Lisa] Beltemacchi, ever informing William Barker that he could work on Sunday, May 18, 2014." Doc. 121-2 at ¶ 11. Plaintiffs contend that this averment contradicts Weingarten's deposition testimony that she was "not one hundred percent sure" whether she, did "not definitively" remember whether she, and believed she "might not have" participated in a conference call in which William asserted that Beltemacchi had given him permission to work on that date. Doc. 131-3 at 58. The affidavit does not contradict the deposition. Weingarten's averment that she was unaware of anyone *granting* William permission to work on May 18, 2014 is not inconsistent with her testimony that she did not recall whether she was on a specific phone call in which William *asserted* that he had been given such permission.

Paragraph 7 of Weingarten's affidavit avers that William was "expressly instructed by Gusmano that he would not able to work on Sundays due to issues between co-worker Johanna Schmidt and him." Doc. 121-2 at ¶ 7. Plaintiffs contend that this averment contradicts Weingarten's deposition testimony that

> [W]e need to schedule [William and Johanna Schmidt] at different times *unless there's another supervisor present*. … Will asked if he could work Sunday. He was told no because Johanna typically worked Sundays and it would be -- and he did not typically work Sundays. … And Donna told him no because Johanna was scheduled to work that Sunday.

Doc. 131-3 at 57-58 (emphasis added). It is true that Weingarten's testimony, but not her affidavit, recognizes that William and Schmidt could work at the same time so long as another supervisor was present. But the affidavit does not contradict the testimony, for it does not foreclose the possibility that the two could work together were another supervisor present. For purposes of this motion, the court will assume that Quick Test's policy would have allowed William and Schmidt to work at the same time if another supervisor were present.

Finally, Plaintiffs contend that ¶¶ 8-9 of Gusmano's affidavit suggests that William unconditionally prohibited from working on Sunday, Doc. 121-4 at ¶¶ 8-9, while at her deposition she testified that William was prohibited from working on Sundays only if Schmidt was present and another supervisor was not. Doc. 131-2 at 64, 67-68. Plaintiffs misread Gusmano's affidavit, which expressly recognizes that "Quick Test had previously decided that Schmidt and [William Barker] could not be scheduled to work at the same time unless another supervisor was present." Doc. 121-4 at ¶ 9. There is little if any daylight, let alone a contradiction, between Gusmano's affidavit and her deposition testimony.

### 3. Plaintiffs' Motion to Deem Their Additional Facts Admitted and/or to Strike Defendants' Responses to Plaintiffs' Additional Facts

Plaintiffs seek to strike certain portions of Defendants' response to Plaintiffs' Local Rule 56.1(b)(3)(C) statement of additional material facts or, in the alternative, to deem admitted several of Plaintiffs' factual assertions. Doc. 144. Plaintiffs contend that Defendants improperly dispute Plaintiffs' factual assertions by responding that the assertions are "unsupported by the record cited" by Plaintiffs' Local Rule 56.1(b)(3)(C) statement. Doc. 141 at ¶¶ 6-10, 12, 14-15, 20, 22-23, 27-28, 30-31, 35, 38, 41-42, 44, 46, 52, 55, 61-65, 68-82, 84-86, 88-95, 97-98, 101, 103. Those denials, Plaintiffs maintain, "are unsupported by any specific citation," Doc. 144 at ¶ 7, in violation of Local Rule 56.1(a), which provides that the movant's response to the non-movant's Local Rule 56.1(b)(3)(C) statement must comply with Local Rule 56.1(b)(3)(B), which in turn requires a denial to be supported with "specific references to the affidavits, parts of the record, and other supported materials relied upon." N.D. Ill. L.R. 56.1(a)-(b).

There was no violation of Local Rule 56.1(a). When Defendants respond to a factual assertion by noting that the assertion is "unsupported by the record cited," they plainly are citing

the very part of the record upon which Plaintiffs relied.  For example, ¶ 6 of Plaintiff's Local

Rule 56.1(b)(3)(C) statement asserts:

> Plaintiffs' at home recruiting was mostly on the phone, but sometimes
> Plaintiffs would talk directly to Respondents, in their homes.  (WB pg. 170).
> Will Barker would be on his phone, while Patricia would be on her phone.
> (WB 170).  Will Barker testified that if he was not at work, he was at home all
> day trying to recruit.

Doc. 141 at ¶ 6.  Defendants respond:

> Defendants admit that William Barker testified that he and Patricia Barker
> mostly performed pre-recruiting work on their cell phones.  Defendants deny
> the remaining averments of Paragraph No. 6 as unsupported by the record
> cited and deny the averments in Paragraph No. 6 are material to the pending
> motion for summary judgment.

*Ibid*.  It is clear that Defendants are supporting their denial with "WB 170," the shorthand that

Plaintiffs used for page 170 of William's deposition.  The same pattern repeats for the other

denials challenged by Plaintiffs.

Plaintiffs also move for the court to deem admitted ¶¶ 7, 13, 40-41, 62, 66, 69, 72-73, 78-

79, 85, 92, 94, 97, and 99-100 of their Local Rule 56.1(b)(3)(C) statement because of alleged

improprieties in Defendants' responses to those facts.  Doc. 144 at ¶¶ 11, 13, 18.  Plaintiffs'

motion is denied as to ¶¶ 7, 13, 40, 66, and 99-100, because there is nothing improper with

Defendants' responses to those facts—though they merely establish factual disputes, which on

summary judgment are resolved in Plaintiffs' favor, *see Woods v. City of Berwyn*, 803 F.3d 865,

867 (7th Cir. 2015).  Plaintiffs' motion is denied as to ¶ 41, as Defendants correctly contend that

the assertion, "Jordan [Luzadder] also said that the order came from Lori W[eingarten]," Doc.

141 at ¶¶ 10, 41, which is drawn from Beltemacchi's deposition, Doc. 131-1 at 71, is

inadmissible hearsay, and a "party may not rely upon inadmissible hearsay to oppose a motion

for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).  Plaintiffs'

motion is denied as moot as to ¶¶ 62, 69, 78-79, 85, 92, 94, and 97, as Defendants deny those

statements as unsupported by the record cited, which is a proper denial regardless of other grounds supporting the denial. Plaintiffs' motion is granted with respect to ¶¶ 72-73, because Defendants incorrectly contend that these assertions are not supported by admissible evidence when in fact they cite William's affidavit, which is admissible.

**B.    Factual Background**

With these evidentiary matters resolved, the court sets forth the Local Rule 56.1-compliant facts in the light most favorable to Plaintiffs. *See Woods*, 803 F.3d at 867. In considering Defendants' summary judgment motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

Quick Test provides marketing research services to commercial businesses. Doc. 130 at ¶ 1; Doc. 141 at ¶ 1. It conducts consumer interviews in several retail malls in the United States, including the Louis Joliet Mall in Joliet, Illinois. Doc. 130 at ¶¶ 1-2. Quick Test generally staffs its mall locations with a manager, who supervises and distributes work; a "salaried supervisor"; one to four "hourly supervisors"; and several data collection specialists, called "interviewers," who interview consumers. *Id*. at ¶¶ 2, 7-8. At the Joliet location, Quick Test employed at any given time between ten and fifteen interviewers and two or three hourly supervisors. *Id*. at ¶ 9.

Interviewer and hourly supervisor are non-exempt positions paid on an hourly basis and eligible for overtime pay for hours worked over forty in a work week. *Id*. at ¶ 4. Interviewers and hourly supervisors receive commissions for recruiting interview subjects and, in some circumstances, conducting the interviews themselves. *Id*. at ¶¶ 4, 15-16. If on a single day an interviewer recruits enough subjects or completes enough interviews that her commission pay exceeds her hourly pay for the day, she receives her commission payment in place of—not in

addition to—her hourly wages. *Id*. at ¶ 17. The commission rate varies by project and at times by day within a given project. *Id*. at ¶ 16. The manager of each Quick Test location sets the commission rates at that location. *Ibid*.

William worked at Quick Test's Joliet location as an interviewer from August 2010 to May 2011, at which time he was promoted to hourly supervisor. *Id*. at ¶ 3. He held that position until May 19, 2014, when Quick Test terminated him. *Ibid*. Patricia, his wife, worked as an interviewer at Quick Test's Joliet location from January 2011 to May 19, 2014, when she was terminated as well. *Id*. at ¶ 2. Lisa Beltemacchi was the manager of the Joliet location at all relevant times. *Id*. at ¶ 14.

Plaintiffs assert that they both worked from home recruiting individuals for interviews. *Id*. at ¶ 18. This additional work occurred over an eight-month period in 2012. *Ibid*. Patricia testified that she wrote notes to herself that memorialized occasions on which Beltemacchi told employees to work at home, though the notes are not part of the record. Doc. 141 at ¶ 8. Much of Plaintiffs' alleged work at home consisted of "pre-recruiting" potential interview subjects over the phone. *Id*. at ¶ 6. Plaintiffs returned completed pre-recruitment forms to Beltemacchi, indicating that she was (or should have) been aware that they were working from home. *Id*. at ¶ 7. Plaintiffs assert that Beltemacchi knew that Plaintiffs were entitled to pay for the work they did at home. *Id*. at ¶ 5.

Plaintiffs cannot estimate how many hours per week they spent performing work from home, and they do not have any documents reflecting the time spent performing such work. Doc. 130 at ¶ 19-20, 22-25. Although Plaintiffs assert in their Local Rule 56.1(b)(3)(C) statement that they often worked from home until 9:00 p.m., Doc. 141 at ¶ 4, the cited record material does not support their assertion. Patricia testified that she did not know if she had

performed more than ten hours of work from home, and she could not remember how many hours William worked from home. Doc. 130 at ¶¶ 23, 25. Similarly, Plaintiffs assert that they earned commissions for which they were not paid, but they cannot identify when they did not receive their full commissions, do not know how much they are allegedly owed, and do not have any documents showing changes made to their commissions. *Id*. at ¶¶ 26-29. On an unspecified date, Teresa Linson, a Quick Test interviewer, witnessed an hourly supervisor removing from the Quick Test system commissions that Patricia had earned, which resulted in Patricia not being credited for them. Doc. 131-6 at ¶¶ 12-14; Doc. 141 at ¶ 10.

On June 13, 2013, Patricia filed this suit. Doc. 130 at ¶ 30. Shortly thereafter, Beltemacchi told Patricia that Quick Test had fired an employee for suing Quick Test and implied that Patricia might soon be fired as well. Doc. 141 at ¶ 20. Quick Test expressly told Beltemacchi not to retaliate against Patricia. *Ibid*. Soon after she filed suit, Patricia had several commissions taken from her and other unspecified restrictions placed on her work. *Id*. at ¶ 21.

William was under consideration for promotion in Summer 2013, but Beltemacchi informed him sometime after September 23, 2013 that he was no longer under consideration due to his wife's suit against Quick Test. *Id*. at ¶ 22. William received a written warning on July 23, 2013 for failure to sign a required report. Doc. 130 at ¶¶ 34-37; Doc. 141 at ¶ 15. On January 2, 2014, William emailed Donna Gusmano, Quick Test's Payroll and Human Resources Manager, to inform her that he had "filed a lawsuit against Quick Test." *Id*. at ¶¶ 17, 23. Five days later, on January 7, 2014, Plaintiffs amended their complaint, which at the time was a putative class action, Doc. 39, to add William as a named plaintiff. Doc. 130 at ¶ 33. The same day, William received a written warning for failure to make a shipment on time. *Id*. at ¶¶ 38-39; Doc. 141 at ¶ 24.

On January 20, 2014, William received a written warning for arriving late to work on two consecutive Saturdays, and he received an additional warning on May 12, 2014 for tardiness. Doc. 130 at ¶¶ 40-41, 46-47. William admits that he was late to work on those days and that Saturdays are the most important days for Quick Test's business, *id*. at ¶¶ 41, 43, but he believes that the warning was retaliation for joining this suit, *id*. at ¶¶ 41, 44. Plaintiffs assert that William was late on the two Saturdays in January due to snowstorms in the Chicago area and that Beltemacchi had indicated that snowstorms allow for general "leeway" in terms of tardiness. Doc. 141 at ¶¶ 24-26. Neither party adduces evidence regarding weather conditions on the Saturdays in question. Beltemacchi was late numerous times and never disciplined. Doc. 131-1 at 29-30. At least one hourly supervisor, Jordan Luzadder, was late to work several times, and was eventually "written up" and terminated for leaving work early. Doc. 141 at ¶ 27.

At an unspecified date after joining this suit, William arrived at work and found other Quick Test interviewers doing work for SBA, a Quick Test client for which he had performed 90 percent of the recruiting duties. Doc. 130 at ¶¶ 72-73; Doc. 141 at ¶ 39. William continued to perform his typical recruiting work for SBA, although at least one other Quick Test interviewer did as well. Doc. 130 at ¶¶ 74-75; Doc. 141 at ¶ 40. In February 2014, William asked Patricia to retrieve his paycheck from Quick Test. Doc. 130 at ¶ 77; Doc. 141 at ¶¶ 40-41. Quick Test did not release William's paycheck to Patricia, so William picked up the paycheck himself later that day. Doc. 130 at ¶¶ 77-78.

Patricia and William assert that after January 3, 2014, Quick Test began to schedule them for fewer hours. *Id*. at ¶ 82. On two schedules, for the weeks of January 23-29, 2014 and February 3-9, 2014, William was scheduled for only three days while three or four other employees were scheduled for six or seven days. Doc. 131-2 at 28; Doc. 141 at ¶¶ 32-33. But

between January 1, 2014, and May 22, 2014, William worked more hours than any other individual at the Joliet location except for Beltemacchi, his manager. Doc. 130 at ¶¶ 86-87. In the last four weeks of January 2014, Patricia worked a total of 31.75 hours; during the same period in January 2013, she worked 103.55 hours. Doc. 131-1 at 117; Doc. 141 at ¶ 35. Still, between January 1, 2014, and May 22, 2014, Patricia worked the third-highest number of hours of any interviewer at Quick Test's Juliet location. Doc. 130 at ¶ 88.

In March 2014, Johanna Schmidt, an interviewer at the Joliet location, informed Quick Test's main office in Florida that William was sexually harassing her. *Id*. at ¶ 50. Quick Test conducted an investigation, and both Schmidt and another interviewer at the Joliet location reported that William had inappropriately touched them. *Id*. at ¶¶ 51-53; Doc. 141 at ¶ 72. William denied the charges, and Quick Test sent memoranda to Schmidt and William stating that "Quick Test was unable to conclude" that he had "engaged in th[e] conduct." Doc. 121-14; Doc. 121-15; Doc. 130 at ¶¶ 54-57; Doc. 141 at ¶¶ 72-75.

On April 12, 2014, the day William and Schmidt received the memoranda, Schmidt called Quick Test's main office to report an incident with William. *Id*. at ¶ 59. Schmidt claimed that William unreasonably dismissed her from work for taking what he viewed as an excessively long bathroom break. Doc. 121-16. Quick Test investigated once again and ultimately took two remedial measures: it prohibited William and Schmidt from working the same shift unless another supervisor was present, and it established that William would in the future have to submit any proposed employee discipline to Gusmano for review. Doc. 130 at ¶¶ 61-62; Doc. 141 at ¶¶ 43-44, 47-49, 64-65. William previously had been permitted to issue written warnings to interviewers without seeking permission from Beltemacchi or Quick Test's main office. Doc. 130 at ¶ 80; Doc. 141 at ¶ 43.

On May 8, 2014, William asked Beltemacchi if he could be scheduled to work every second Sunday, although Schmidt typically worked on Sundays. Doc. 130 at ¶ 63. Beltemacchi declined the request, noting that she was not "allowed to have William Barker and Johanna Schmidt work the same shift without another Supervisor present," that she would be unable to replace Schmidt's Sunday hours with hours elsewhere in the week, and that she "couldn't afford" to have another supervisor work on Sundays for the purpose of allowing Schmidt and William to work at the same time. *Ibid.*; Doc. 131-10; Doc. 141 at ¶ 50. Four days later, on May 12, William emailed Gusmano asking to be permitted to work every other Sunday and complaining about what he deemed retaliation for joining this suit. Doc. 121-19; Doc. 130 at ¶ 64; Doc. 141 at ¶ 52. On May 13, Gusmano responded that it would be unfair to Schmidt to reduce her Sunday hours and denied that Quick Test had retaliated against William for joining his wife's lawsuit. Doc. 121-20; Doc. 130 at ¶ 65; Doc. 141 at ¶¶ 55-56.

On May 19, 2014, Quick Test learned that William had worked for over four hours on May 18, 2014, a Sunday. Doc. 130 at ¶ 66. Another hourly supervisor was present during the entire time that William worked. Doc. 141 at ¶¶ 64-66. Quick Test Senior Vice President Lori Weingarten immediately terminated William, and Gusmano and Beltemacchi conveyed the termination to Barker over the telephone. Doc. 121-2 at ¶ 9; Doc. 130 at ¶ 67; Doc. 141 at ¶¶ 54, 58, 99-100. The parties dispute whether Weingarten participated in that call, and Weingarten herself cannot remember. *Id*. at ¶¶ 58, 100. William claimed that on May 17, 2014, Beltemacchi had given him permission to work on Sunday, May 18, 2014; Beltemacchi denies that she ever granted such permission. Doc. 130 at ¶¶ 68-69; Doc. 141 at ¶¶ 53, 59-60, 62, 100.

Prior to May 2013, Quick Test was a wholly owned subsidiary of MVL Group. Doc. 130 at ¶ 92. Although it owned Quick Test, MVL Group did not have authority to hire and fire

Quick Test employees, and Quick Test was solely responsible for setting its internal rules and managing its employment relationships. *Id.* at ¶ 94. MVL Group likewise had no involvement in supervising Quick Test employees, processing Quick Test's payroll, paying the employer portion of Quick Test's payroll taxes, unemployment insurance, and workers' compensation insurance, or maintaining Quick Test's employment records. *Id.* at ¶¶ 95-96. In May 2013, MVL Group sold its ownership interest in Quick Test and has since had no business relationship with Quick Test. *Id.* at ¶ 93.

**Discussion**

I.      **Wage-and-Hour Claims**

        A.      **FLSA and IMWL Claims**

Because an IMWL violation is "contingent on establishing a violation under the FLSA," *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 367, 369, 376 (7th Cir. 2005), Plaintiffs' claims under the two statutes will be addressed together. "The FLSA's two core provisions—the minimum wage provision and the overtime provision—require that employees receive a minimum wage for each hour that they are 'employ[ed]' as well as a premium wage (one and one-half times the regular rate of pay) for each hour they are 'employ[ed]' beyond forty hours in one work week." *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 735 F.3d 568, 570 (7th Cir. 2013) (quoting 29 U.S.C. §§ 206(a), 207(a)); *see also Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011) ("The FLSA requires employers to pay overtime to certain employees who work more than 40 hours in a work week."). Under the FLSA, "the employee bears the burden of proving that she performed overtime work for which she was not properly compensated." *Kellar*, 664 F.3d at 173. Where, as here, an employee "contends that his employer's records are not accurate," she "must produce[] sufficient evidence to show the amount and extent of that

work as a matter of just and reasonable inference." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded on other grounds by statute*, Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-262) (alteration in original) (internal quotation marks omitted); *see also Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 669 n.2 (7th Cir. 2010); *Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 594-95 (7th Cir. 2008). "[M]ere assertions are insufficient to create a jury issue." *Turner*, 595 F.3d at 691; *see also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) ("[I]t is axiomatic that a plaintiff's conclusory statements do not create an issue of fact.") (alteration and internal quotation marks omitted).

Plaintiffs do not dispute that they were paid at least the applicable minimum wage. Doc. 39 at ¶¶ 44-45; Doc. 130 at ¶¶ 5-6, 17. Rather, they allege that: (1) the ability of interviewers and hourly supervisors to earn commissions means that those commissions should have factored into the "regular rate of pay" for purposes of calculating their overtime pay rate, Doc. 39 at ¶¶ 42-63, 69-76, 94-96; and (2) they worked hours for which they were not compensated at all, *id*. at ¶¶ 64-68, 94-108.

The FLSA defines the "regular rate of pay" as "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). "[A]lthough the regular rate of pay is expressed in terms of an hourly wage, employees may, in practice, be paid in a variety of other ways," including commissions, which may affect determination of an employee's hourly wage. *Urnikis-Negro*, 616 F.3d at 673. Quick Test argues that its commissions are not part of the "regular rate" for calculating overtime pay because they are offered merely "to incentivize [the] interviewers by providing them the opportunity to earn a commission." Doc. 120 at 3-4. Yet because it offers employees a commission for *every* interview subject recruited, Quick Test

seems less to be providing an "opportunity to earn a commission" than demanding that employees do so simply by performing their jobs. A Quick Test interviewer, whose primary job function is to recruit individuals for and conduct interviews, cannot reasonably be said to earning a commission separate from her "regular" pay by recruiting individuals for and conducting interviews. Her commission pay may be independent of the number of hours worked, but under 29 U.S.C. § 207(e)(3)(a), such fixed incentive-based or bonus pay "must be included in the regular rate unless it is entirely discretionary with the employer—which the disbursement of" commissions for recruitment was not. *Reich v. Insterstate Brands Corp.*, 57 F.3d 574, 577 (7th Cir. 1995); *see also Brock v. Two "R" Drilling Co., Inc.*, 789 F.2d 1177, 1179 (5th Cir. 1986).

So Plaintiffs might have demonstrated that Quick Test's wage payment scheme violates the FLSA's overtime provisions by failing to account for "commissions" in ascertaining their regular pay rate. What Plaintiffs have not shown with properly adduced evidence, however, is that they satisfied the requirement for receiving overtime pay in the first place—that they worked more than forty hours per week. Plaintiffs testified that they have not estimated and could not estimate how many overtime hours they worked, or how many hours they worked from home per week, and they have no documents reflecting the time spent performing out-of-office or overtime work. Doc. 130 at ¶¶ 19-20, 22-25; Doc. 141 at ¶¶ 4, 7.

Specifically, Patricia testified that she did not know if she had performed even ten hours of work from home and that she could not remember how many hours William worked from home. *Id*. at ¶¶ 23, 25. This is significant, for if Plaintiffs never worked more than forty hours per week, they cannot have been improperly denied overtime pay. This remains the case even if Beltemacchi intended for Plaintiffs to work from home, was aware that they were doing so, and knew that they were entitled to pay for the work done. *Id*. at ¶¶ 5, 7-8. Likewise, if Plaintiffs

cannot even estimate how many hours they worked from home, they cannot recover for those hours. As noted, where plaintiffs "contend[] that [the employer's] records are not accurate," they "must produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Turner*, 595 F.3d at 691. This they have failed to do.

The same holds for William's allegedly withheld commissions. Plaintiffs maintain that William earned commissions for which he was not paid, but they cannot identify when he earned them or how much he is owed, and they do not have any documents to support his claim. Doc. 130 at ¶¶ 26-28. Plaintiffs are left only with their allegations, but it is "axiomatic that a plaintiff's conclusory statements do not create an issue of fact." *Sublett*, 463 F.3d at 740.

The story is more complex for Patricia's commissions. Although Plaintiffs cannot identify when she earned her allegedly withheld commissions or how much she is owed, Linson saw Luzadder remove from the Quick Test payment system commissions that should have been credited to Patricia and estimates that she was due commissions from "75 or so" surveys. Doc. 131-6 at ¶¶ 12, 14. As discussed below, this is enough to forestall summary judgment on the claim that Quick Test unlawfully withheld commissions from Patricia. But because it establishes neither that Patricia was paid below the minimum wage for any of her hours worked (since she does not allege that she was not paid her non-commission wage for those hours, even though the commissions, if paid, would have replaced that wage, Doc. 130 at ¶ 17) nor that she did not receive overtime pay for any specific number of hours worked over forty in a work week, it does not provide support for FLSA and IMWL claims. For these reasons, Quick Test is entitled to summary judgment on Plaintiffs' FLSA and IMWL wage-and-hour claims.

## B.    IWPCA Claims

Unlike the FLSA and the IMWL, the IWPCA does not establish a substantive right to payment of any particular regular or overtime wage, instead "provid[ing] employees with a cause of action for the timely and complete payment of earned wages or final compensation." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (internal quotation marks omitted).   The IWPCA requires only that an employer "at least semi-monthly … pay every employee all wages earned during the semi-monthly pay period," 820 ILCS 115/3, with "wages" defined as "any compensation owed an employee by an employer *pursuant to an employment contract or agreement* between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation," 820 ILCS 115/2 (emphasis added).   As the emphasized text makes clear, the IWPCA mandates payment of wages only to the extent the parties' contract or agreement requires such payment.  *See Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 567 (7th Cir. 2016) ("The [IWPCA] defines 'wages' narrowly ….  As such, to state a claim under the IWPCA, the [plaintiffs] are required to demonstrate that they are owed compensation from defendants pursuant to an employment agreement."); *Almy v. Kickert Sch. Bus Line, Inc.*, 722 F.3d 1069, 1075 (7th Cir. 2013) (holding that the IWPCA "entitles workers to the compensation owed under their employment agreement").   Accordingly, with exceptions not pertinent here, *see also Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) ("Illinois courts have explained that an agreement under the IWPCA is broader than a contract.") (internal quotation marks omitted), Plaintiffs must satisfy the Illinois standard for breach of contract to show an IWPCA violation.  *See Enger*, 812 F.3d at 570 ("[T]he IWPCA provides no substantive relief beyond what the underlying employment contract requires."); *Hess*, 668 F.3d at 452-53.

Plaintiffs allege that Quick Test's failure to pay certain commissions breached their employment contract and violates the IWPCA. Doc. 39 at ¶¶ 77-93. "Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (internal quotation marks omitted); *see also Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016) ("To prevail on a breach of contract claim in Illinois … the plaintiffs must show that there was a contract between the parties, and that [the defendants] breached the contract by failing to adhere to its terms."). Quick Test focuses exclusively on the fourth element, arguing that because Plaintiffs have adduced no documents supporting the number of off-the-clock hours they worked or the amount of commissions that were withheld, they have not shown concrete injury with specific damage calculations. Doc. 120 at 8-9; Doc. 138 at 6.

"In Illinois, in order to recover for breach of contract, a plaintiff must establish both that he sustained damages … [and] he must also establish a reasonable basis for computation of those damages." *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 632 (7th Cir. 2007) (alteration and omission in original) (internal quotation marks omitted). Specifically, "[t]he party claiming damages bears the burden of proving those damages to a reasonable degree of certainty." *Ibid.*; *see also Cogswell v. CitiFinancial Mortg. Co.*, 624 F.3d 395, 401 n.3 (7th Cir. 2010). As for William, Plaintiffs rely solely on his testimony to support the proposition that some of his commissions were withheld. This is not problematic by itself, but William's testimony does not even remotely specify the date, number, or amount of commissions that Quick Test allegedly refused to pay. This thin record would not permit a reasonable jury to find that Plaintiffs established a "reasonable basis for the computation" of the damages element of

William's IWPCA claim.  *TAS*, 491 F.3d at 632; *see also Merry Gentleman, LLC v. George & Leona Prods., Inc.*, 799 F.3d 827 (7th Cir. 2015) (affirming summary judgment for the defendant where the plaintiff had failed to propose a legally viable damages theory on the summary judgment record).  Summary judgment is therefore warranted on William's IWPCA claim.

But the same is not true for Patricia's IWPCA claim.  Linson avers that she saw Luzadder remove some number of commissions due to Patricia for the "75 or so" surveys that the Quick Test payroll system indicated that she had completed.  Doc. 131-6 at ¶¶ 12-15.  Although Plaintiffs provide no other information about these commissions, including the dates on which Patricia earned them or their estimated value, knowing that some commissions definitely were withheld provides a reasonable basis for the computation of damages.  Summary judgment is therefore denied on Patricia's IWPCA claim.

## II.     Retaliation Claims

The FLSA prohibits "any person … to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA.  29 U.S.C. § 215(a)(3).  This prohibition applies "whether or not the employer's conduct does in fact violate" the FLSA, so the failure of Plaintiffs' FLSA wage-and-hour claims does not defeat their FLSA retaliation claims. *Sapperstein v. Hager*, 188 F.3d 852, 857 (7th Cir. 1999).  The FLSA does not protect complainants from *all* discipline; it merely proscribes discriminatory or retaliatory discipline. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 507 (7th Cir. 2004); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002) ("An employee's complaint … does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior."), *overruled on other grounds*, *Hill*, 724 F.3d at 967 n.1.

FLSA retaliation claims are assessed in the same manner as retaliation claims under other employment statutes. *See Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810 (7th Cir. 2005); *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 940 (7th Cir. 1999). Thus, Plaintiffs may seek to forestall summary judgment under either the direct or indirect methods of proof. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012); *Cichon*, 401 F.3d at 810. Plaintiffs press only the direct method, Doc. 129 at 14-15, so the court limits its discussion to that method. *See Porter v. City of Chicago*, 700 F.3d 944, 957 (7th Cir. 2012) (proceeding "only under the direct method of proof" because the plaintiff did not press the indirect method). To forestall summary judgment under the direct method, Plaintiffs "must show: (1) [they] engaged in protected expression; (2) that [they] suffered an adverse employment action; and (3) that a causal link existed between the protected expression and the adverse action." *Kasten*, 703 F.3d at 972. Quick Test focuses on the third element, causation.

Causation can be shown by "providing evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the [employment action]." *Carter v. Chi. State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015) (alteration in original). A direct-method plaintiff may use "direct or circumstantial" evidence to show causation. *Harper v. Fulton Cnty.*, 748 F.3d 761, 765 (7th Cir. 2014). "Direct evidence is evidence, which if believed by the finder of fact will prove the particular fact in question without reliance upon inference or presumption." *Kasten*, 703 F.3d at 972 (internal quotation marks omitted). The record unsurprisingly does not include any direct evidence that Plaintiffs were subjected to adverse action because of their FLSA-protected conduct (filing and joining this lawsuit). In the absence of direct evidence, Plaintiffs can rely on "[c]ircumstantial evidence, which allows a jury to infer retaliation," and which "may

include: (1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Id.* at 973.

### A. Written Warnings to William

Quick Test seeks summary judgment on William's claim that he received four disciplinary warnings in retaliation for his FLSA-protected conduct:

- *July 23, 2013*. William does not challenge Quick Test's position on the July 23, 2013 disciplinary warning. This discipline occurred before William joined this suit, and Plaintiffs concede that it was appropriate for Quick Test to send the warning. Doc. 121-8; Doc. 130 at ¶¶ 34-37.

- *January 7, 2014*. William notified Quick Test on January 2, 2014 that he intended to join this suit, and he joined the suit five days later. *Id.* at ¶ 33; Doc. 141 at ¶¶ 17, 23. He received a disciplinary warning on January 7, 2014 for failing to make a shipment on time. Doc. 121-9 at 2; Doc. 130 at ¶¶ 38-39; Doc. 141 at ¶ 24. Plaintiffs concede that William indeed failed to make the shipment on time, signed a form indicating that he agreed with the discipline, and "couldn't say yes or no" when testifying as to whether the discipline was retaliatory for his joining the suit. Doc. 130 at ¶ 39.

- *January 20, 2014*. On January 20, 2014, two weeks after joining this suit, William received a written warning after arriving late to work on two consecutive Saturdays and for what Quick Test charged was low production on those days. Doc. 121-10; Doc. 130 at ¶¶ 40-41. Plaintiffs concede that William arrived 37 minutes late the first Saturday and 96 minutes late the next, *id.* at ¶ 41, and further admit that Saturday is Quick Test's most important day of business and that the discipline would have been issued even if lateness (and not low production) had been the only issue. *Id.* at ¶¶ 43-45.

- *May 12, 2014*. William received a written warning on May 12, 2014. Doc. 121-11; Doc. 130 at ¶ 46. Plaintiffs concede that on May 10, 2014, William opened the Joliet location 73 minutes late after forgetting his key at home. *Id.* at ¶¶ 46-47.

Quick Test is entitled to summary judgment on the July 23, 2013, January 7, 2014, and May 12, 2014 warnings, as Plaintiffs have not "presented any evidence to impugn [Quick Test's] credibility or motivation, and thus they cannot establish a nexus between their … complaints and [Quick Test's] decision" to issue the warnings. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d

772, 785-86 (7th Cir. 2007). Plaintiffs concede that William was appropriately given the July 23, 2013 disciplinary warning, Doc. 130 at ¶¶ 34-37, and that William signed a form indicating that he agreed with the discipline on January 7, 2014 for failing to make a shipment on time, *id*. at ¶ 39. For the January 7 warning, Plaintiffs retort that the timing "supports [William's] retaliation claims in a very obvious manner," as "this discipline was issued days after" William joined this suit. Doc. 129 at 15, 20. Yet "suspicious timing must be evaluated in the context of the whole record," *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 495-96 (7th Cir. 2014), and Plaintiffs' concession that William engaged in the behavior for which he was disciplined shows a non-retaliatory motivation. *See id*. at 496 (holding that suspicious timing, "[s]tanding alone, … is rarely sufficient to create a triable issue").

For the May 12, 2014 warning, Plaintiffs *assert* that Beltemacchi told William that forgetting the key was forgivable because "mistakes happen," Doc. 141 at ¶ 51, but the portion of Beltemacchi's deposition cited by Plaintiffs, Doc. 131-1 at 54, does not support that assertion. Even if Beltemacchi had said that, moreover, the fact that William was disciplined for an incident for which he admits he was at fault, Doc. 141 at ¶¶ 26-27, defeats a causal nexus or inference of retaliation. *See Hall*, 276 F.3d at 359 ("While Title VII protects victims of sexual harassment from being terminated in retaliation for reporting harassment, an employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior."); *Durgins v. City of E. St. Louis*, 272 F.3d 841, 843 (7th Cir. 2001) ("An employer that finds during an investigation … that it should not have hired the person in the first person may decide to end the employment without any objection that this is 'retaliation' for the … suit.") (citing *McKennon v. Nashville Banner Pub'g Co.*, 513 U.S. 352 (1995)). Nor have Plaintiffs shown that any similarly situated employee who

engaged in similar conduct was treated differently.  *See Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) ("Mr. Harper failed to identify any other instructor who had a comparable attendance record, and his argument with respect to the disparities in C.R. England's treatment of its employees is therefore unsupported by the record."); *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) ("[Argyropoulos] has not identified any other employee who engaged in comparable misconduct. … Only if the other employee had engaged in similar misconduct while employed by the City would this employee possibly serve as a useful comparator.") (alteration omitted).  Summary judgment is appropriate as to the May 12, 2014 warning.

Quick Test is not entitled to summary judgment on the retaliation claim regarding the January 20, 2014 warning.  Beltemacchi testified in her deposition that "a snowstorm would be an extenuating circumstance that would allow [William] to be late" to work, "[d]epending on the snowstorms, because Chicago has snow in the winter."  Doc. 131-1 at 18.  Quick Test argues that this "is not remarkable position for an employer," as "employers make decisions in the Chicagoland area every winter as to whether a given snowstorm will or will not excuse tardiness."  Doc. 138 at 9.  This is true as far as it goes, but the issue here is not whether Beltemacchi's policy is sensible, but instead whether it provided a rationale not to discipline William's late arrivals.  Plaintiffs contend that William's tardiness on the two Saturdays prior to January 20, 2014 were weather-related, and Quick Test, although it disputes the scope of Beltemacchi's statement, Doc. 141 at ¶ 26, has adduced no evidence—such as weather records for the days in question—to establish that the dispute is not genuine.  Beltemacchi also admits that she was late on numerous occasions and was not disciplined, Doc. 131-1 at 29-30, which at the very least suggests that a comparator was treated differently than William, Doc. 138 at 10.  Given this, William's admission that Luzadder, another hourly supervisor, was "written up" and

terminated for leaving work early (itself possibly a distinct offense from arriving late), Doc. 141 at ¶ 27, does not provide grounds for summary judgment.

**B.  William's Termination**

Quick Test also seeks summary judgment on William's claim that he was terminated in May 2014 in retaliation for his joining this suit in January 2014.  Quick Test contends that it terminated William not for retaliatory purposes, but because he worked on a Sunday despite express instructions not to do so.  This argument fails, at least on summary judgment.

To review the factual background: Following its investigations into Schmidt's sexual harassment allegations, Quick Test implemented a policy that prohibited Barker and Schmidt from working on the same day without another supervisor present.  Doc. 130 at ¶¶ 61-62; Doc. 141 at ¶¶ 43-45, 47-49, 64-65.  In the days leading to his termination, William asked Beltemacchi and Gusmano if he could be scheduled to work every second Sunday.  Doc. 121-19; Doc. 121-20; Doc. 130 at ¶¶ 63-65; Doc. 131-10; Doc. 141 at ¶¶ 50, 52, 55-56.  Beltemacchi and Gusmano declined William's requests, citing the policy and reasoning that because Schmidt typically worked on Sundays, and because Quick Test could not afford to have William, Schmidt, and another supervisor all work on Sundays, William was not permitted to work on Sundays.  Doc. 121-20; Doc. 130 at ¶¶ 63-65; Doc. 131-10; Doc. 141 at ¶¶ 50, 52, 55-56.  When, on May 18, 2014, the first Sunday after this exchange, William arrived at work unannounced and proceeded to work for over four hours, Quick Test fired him.  Doc. 130 at ¶ 66.

Quick Test contends that the termination was warranted because Barker disregarded "explicit direction" from Gusmano not to work on Sundays.  Doc. 120 at 17.  But the policy, as everyone involved appears to have understood, and as stated in Gusmano's May 13, 2014 email, was "that Ms. Schmidt and [William] would not be scheduled to work at the same time *unless*

*another supervisor was present*." Doc. 121-20 at 1 (emphasis added). When William worked on May 18, 2014, another hourly supervisor was present for the entirety of his time at work. Doc. 141 at ¶¶ 64-66. Quick Test contends that "the presence of that [other] supervisor is irrelevant," Doc. 138 at 12, but they are wrong, at least on summary judgment. True, Gusmano denied William's request to work every second Sunday, but the rationale for the denial was that he was not permitted to work with Schmidt without the presence of another supervisor, and he did not do that on May 18, 2014. As a result, drawing all reasonable inferences in his favor, William did not violate the policy. Quick Test's contention that Gusmano's response to William's requests to work on Sunday merely "happened to cite the" policy prohibiting him from working with Schmidt unless another supervisor were present, and therefore that William should not have understood the policy to be the operative reason behind the denial, is unpersuasive on summary judgment. *Id*. at 12-13. This is particularly true because, as Quick Test acknowledges, William was scheduled to work the following Sunday, as Schmidt was scheduled to spend that day at a different Quick Test location. Doc. 141 at ¶ 57.

It also bears mention that the summary judgment record would allow a reasonable trier of fact to find that on May 17, 2014, Beltemacchi had given William permission to work the following day. Doc. 130 at ¶¶ 68-69; Doc. 141 at ¶¶ 53, 59-60, 62, 100. Beltemacchi denies that she gave this permission, but the question is genuinely disputed. And although Quick Test contends that it would have been "completely unreasonable for William Barker to rely on permission from Beltemacchi to work on Sunday" because Gusmano outranks Beltemacchi, Doc. 120 at 17; Doc. 138 at 14, disregarding the permission of his direct supervisor could have left William in an untenable position. For all he knew, Gusmano had had a change of heart and decided to communicate it through Beltemacchi.

31

Because Weingarten, who actually fired William, was unaware of Beltemacchi's apparent granting of permission to William to work that Sunday, Quick Test relies on *Turner*, 595 F.3d at 688, for the proposition that because the decisionmaker "was unaware that [William] had received permission" to work, William cannot "establish a causal connection between his protected activity and termination." Doc. 120 at 16. But Beltemacchi testified in her deposition that on the conference call on which she and Gusmano told William that he had been fired, William claimed that he had been given permission to work on that Sunday, Doc. 131-1 at 57, and the parties genuinely dispute whether Weingarten participated on that call. Doc. 141 at ¶¶ 58, 100. As discussed above, Weingarten's affidavit avers that she was unaware of any employee granting William permission to work on Sunday, Doc. 121-2 at ¶ 11, but this does not foreclose that possibility that she was on a call in which William asserted that he had been given such permission. Quick Test argues that "even if Weingarten did learn during the termination meeting that William Barker claimed to have received permission from Beltemacchi to work on Sunday … at the time the decision was made to terminate William Barker's employment, Weingarten was not aware of his claim to have received permission." Doc. 138 at 14. Yet drawing all reasonable inferences in Plaintiffs' favor, if Weingarten was on that call, she knew when she finalized William's termination, regardless of when she had made the initial decision, that William contended that he had received permission to work on that Sunday. Summary judgment is therefore denied on William's retaliatory termination claim.

C.      **Miscellaneous Retaliatory Discipline**

William alleges three additional retaliatory adverse employment actions. "[A]n adverse action must materially alter the terms of conditions of employment to be actionable." *Porter*, 700 F.3d at 954. "To rise to the level of an adverse action, a change must be one that a

reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (internal quotation marks omitted). "This means that the action must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter*, 700 F.3d at 954 (internal quotation marks omitted). None of the three incidents meet this standard.

First, Plaintiffs claim that the "taking of the SBA account" from William for one day constituted an adverse action. Doc. 129 at 22. Yet prior to the incident, William was not Quick Test's only employee who worked on the SBA account, Doc. 130 at ¶ 72, and Plaintiffs concede that after the day in question he serviced the SBA account much or exactly as he did before, with no loss of work. *Id.* at ¶¶ 74-75; Doc. 141 at ¶ 40. The alleged "taking" of the account barely rises to the level of an "action," much less an adverse one under the governing standard. *See Porter*, 700 F.3d at 957 (noting in the context of a brief scheduling change that "we do not think the treatment [the plaintiff] received would dissuade a reasonable worker from seeking an accommodation" for fear of retaliation).

Second, Quick Test's refusal to release William's paycheck to Patricia on one occasion in February 2014, Doc. 129 at 22-23; Doc. 141 at ¶¶ 40-41, was not "more disruptive than a mere inconvenience." *Porter*, 700 F.3d at 954. Plaintiffs submit that William was in jail and needed the paycheck for bail, Doc. 129 at 23, but that submission cannot stand in light of Plaintiffs' concession that William himself retrieved the paycheck that day, Doc. 130 at ¶¶ 77-78. William suffered no loss as a result of Quick Test's refusal to release the check to Patricia.

Third, Plaintiffs contend that the policy requiring Gusmano's approval for issuing discipline applied uniquely to William. Doc. 129 at 23-24. Plaintiffs present no evidence to

support that claim. They instead contend that (1) William was not told that all supervisors were stripped of this authority, Doc. 131-8 at ¶¶ 29-30; (2) Gusmano did not inform William that all supervisors were stripped of this authority or contradict William's use of "I" in an email to refer to those who had had such authority removed, *id.* at ¶¶ 31-34; and (3) a written warning signed by a different Quick Test supervisor indicates that the policy did not apply to all supervisors, Doc. 131-5. Regarding the first two points, William's knowledge of whether the policy applied to all supervisors does not one way or the other indicate whether the policy did in fact apply to all supervisors. The deposition testimony cited by Plaintiffs does not indicate that the policy did not apply to all supervisors; in fact, Beltemacchi testified that the policy even applied to her, even though she outranked William. Doc. 131-1 at 32. As to the other supervisor's warning, Plaintiffs provide no evidence that it was not approved by Quick Test before the supervisor issued the discipline. Doc. 130 at ¶ 62; Doc. 141 at ¶ 44.

### D.     Retaliatory Scheduling

Plaintiffs allege that after William joined this suit in early January 2014, Quick Test reduced their work hours as retaliation. Doc. 129 at 24-25. In support, Plaintiffs note that during the last four weeks of January 2014, Patricia worked 71.8 fewer hours than she had for the comparable period in January 2013, a nearly 70 percent reduction. Doc. 129 at 25; Doc. 131-1 at 30; Doc. 141 at ¶¶ 31, 45. Quick Test retorts that between January 1, 2014, and May 22, 2014, Patricia worked the third-highest number of hours of any interviewer at the Joliet location and that Plaintiffs have not adduced sufficient evidence to perform the required "systematic analysis" comparing Plaintiffs with similarly situated employees. Doc. 138 at 18.

Quick Test is not entitled to summary judgment on Patricia's retaliatory scheduling claim. As Quick Test argues, Doc. 120 at 20, and the record at least somewhat supports, Doc.

130 at ¶¶ 83-85, business conditions, including a dispute with its landlord and reduced foot

traffic at the Louis Joliet Mall, may have required Quick Test to generally reduce hours at the

Joliet location, and it is possible that a systematic analysis would indeed have shown that Patricia

was not subject to a unique reduction in her hours.  But Quick Test does not present a systematic

analysis, and in its absence the extent of the reduction from comparable periods in January 2013

to January 2014 would allow a reasonable jury to find that the reduction resulted from retaliation

rather than from external circumstances.

The same is not true for William.  Plaintiffs adduce no evidence that William suffered a

comparable reduction in hours, or indeed that he suffered any reduction at all compared to his

work over any other time period.  On schedules for the weeks of January 23-29, 2014 and

February 3-9, 2014, William was scheduled for only three days while three or four other

employees were scheduled for six or seven days.  Doc. 131-2 at 28; Doc. 141 at ¶¶ 32-33.  But

Plaintiffs adduce no evidence that these schedules reflected the hours that the employees actually

worked; that, even if they did, they represented a reduction from William's hours over a

comparable time period, whether in January 2013 or some other time; and that, even if they did

that as well, the reduction was of such magnitude as to evince retaliatory animus in the absence

of any other evidence indicating such.  Quick Test further shows that during the period in

question, William worked more hours than any other employee at the Joliet location with the

exception of Beltemacchi, his manager.  Doc. 130 at ¶¶ 86-87.  On this record, a reasonable jury

could not find that William was subject to retaliatory scheduling.

## III.     Claims Against MVL Group

MVL Group moves for summary judgment on the ground that it sold its ownership

interest in Quick Test in May 2013 (before this suit's filing) and has had no further business

relationship with Quick Test since then. Doc. 120 at 21. Plaintiffs do not oppose the motion, but ask without giving any reason that MVL be dismissed *without* prejudice. Doc. 129 at 31.

The dismissal of Plaintiffs' claims against MVL Group will be with prejudice. As an initial matter, by failing to give any reason why the dismissal should be without prejudice, Plaintiffs forfeited the point. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted). In any event, Plaintiffs have no viable claim against MVL Group. Although some of the wage-and-hour claims arise from the period during which MVL Group owned Quick Test, "a parent corporation is not liable for violations of the Fair Labor Standards Act by its subsidiary unless it exercises significant authority over the subsidiary's employment practices." *Teed v. Thomas & Betts Power Sols., L.L.C.*, 711 F.3d 763, 765 (7th Cir. 2013). Nothing in the record suggests that this was the case. To the contrary, the record indisputably shows that MVL Group did not have hiring and firing authority, did not set Quick Test's internal rules, and did not maintain Quick Test's employment records, process its payroll, or engage in a host of similar related administrative actions. Doc. 130 at ¶¶ 94-96.

## Conclusion

For the foregoing reasons, Plaintiffs' motions to strike and to deem facts admitted are granted in part and denied in part, and Defendants' summary judgment motion is granted in part and denied in part. Plaintiffs' motions to strike portions of Defendants' affidavits and to deem certain facts admitted, Docs. 132, 144, are denied except with respect to ¶¶ 72-73 of Plaintiffs' Local Rule 56.1(b)(3)(C) statement, which are deemed admitted. MVL Group is entitled to judgment on all claims against it, which are dismissed with prejudice. Quick Test is entitled to summary judgment on: (1) all FLSA and IMWL claims; (2) William's IWPCA claims; (3) William's retaliatory discipline claim insofar as it pertains to warnings or incidents other than the warning on January 20, 2014; and (4) William's retaliatory scheduling claim. Quick Test is not entitled to summary judgment on: (1) Patricia's IWPCA claims; (2) William's retaliatory discipline claim insofar as it pertains to the warning on January 20, 2014; (3) William's retaliatory termination claim; and (4) Patricia's retaliatory scheduling claim. Those claims, as well as the claims on which Quick Test did not seek summary judgment—Patricia's retaliatory discipline (including her additional scheduling claims) and termination claims, and William's retaliatory denial of a promotion claim—will proceed to trial on May 16, 2016.

March 15, 2016

_____
United States District Judge